IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

RICKY D. LARRY,
     Plaintiff,

vs.                       Case No. 5:16cv107/LAC/EMT

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,
     Defendant.
_____/

## ORDER, REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.* It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83. Upon review of the record before this court, it is

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Fed. R. Civ. P. 25(d), she is therefore automatically substituted for Carolyn W. Colvin as the Defendant in this case.

the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and this case remanded for further administrative proceedings.

I.     PROCEDURAL HISTORY

On February 7, 2012, Plaintiff filed applications for DIB and SSI, and in both applications he alleged disability beginning January 24, 2012 (tr. 36).[2]   His applications were denied initially and on reconsideration, and thereafter Plaintiff requested a hearing before an administrative law judge ("ALJ").   A video hearing was held on February 20, 2014, at which Plaintiff was represented by counsel (*see, e.g.*, tr. 36).   On June 27, 2014, the ALJ issued a decision in which she found Plaintiff "not disabled," as defined under the Act, at any time through the date of her decision (tr. 36–46).   On February 1, 2016, the Appeals Council denied Plaintiff's request for review (tr. 1).   Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.   Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).   This appeal followed.

_____

[2] All references to "tr." refer to the transcript of Social Security Administration record filed on June 30, 2016 (ECF No. 7).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

## II.   FINDINGS OF THE ALJ

On June 27, 2014, the ALJ made several findings relative to the issues raised

in this appeal (tr. 36–46):

1)   Plaintiff meets the insured status of the requirements of the Act through December 31, 2015[3];

2)   Plaintiff has not engaged in substantial gainful activity since January 24, 2012, the alleged onset date;

3)   Plaintiff has the following severe impairments: lumbar disc disease; bilateral knee osteoarthrosis, status post tendon repair and left knee replacement; hypertension; cardiac arrhythmia, status post automatic implantable cardioverter defibrillator implantation; gout; and adjustment disorder with anxious mood;

4)   Plaintiff has no impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

5)   Plaintiff has the residual functional capacity ("RFC") to perform a range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). He can occasionally lift and/or carry up to 20 pounds and frequently lift and/or carry up to 10 pounds. He can stand and/or walk about 6 hours with normal breaks. He can sit about 6 hours with normal breaks. He can occasionally perform all postural activities. He should avoid

---

[3] Thus, the time frame relevant to Plaintiff's claim for SSI is February 7, 2012 (the date he applied for benefits), through June 27, 2014 (the date the ALJ issued her decision). *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which he is both disabled and has an SSI application on file). The time frame relevant to Plaintiff's claim for DIB is nearly the same, January 24, 2012 (alleged onset), through the date of the ALJ's decision (even though Plaintiff was insured for DIB purposes through the end of 2015).

concentrated exposure to hazards. He can understand, learn, and retain simple work instructions. He can sustain attention and persist at simple, routine tasks for extended periods of one-hour segments. He can sustain effort across the workday and workweek with appropriate work breaks. He can maintain regular attendance and be punctual within customary tolerances. He can interact with the public. He can get along with coworkers and peers in an appropriate manner without distracting them or exhibiting behavioral extremes. He can accept instructions and respond appropriately to supervision. He can learn work rules and respond appropriately to changes in a routine work setting. He can adapt to demands and pressures of simple, routine work settings. He can be aware of normal hazards and take appropriate precautions;

6) Plaintiff is unable to perform any past relevant work;

7) Plaintiff was born on December 2, 1962, and was 49 years old—which is defined as a younger individual aged 18 to 49—on the alleged disability onset date. Plaintiff subsequently changed age category to closely approaching advanced age;

8) Plaintiff has at least a high school education and is able to communicate in English;

9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not he has transferable job skills;

10) Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform; and

11) Plaintiff has not been under a disability, as defined in the Act, from January 24, 2012, through June 27, 2014, the date of the decision.

III.  STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison

Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125

F.3d at 1439.  The court may not decide the facts anew, reweigh the  evidence, or

substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d

1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates

against the Commissioner's decision, the decision must be affirmed if supported by

substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify

as a disability the physical or mental impairment must be so severe that the claimant

is not only unable to do his previous work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy."  Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[4] the Commissioner analyzes a

disability claim in five steps:

---

[4] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (see 20 C.F.R. §§ 404, 416).  Therefore, hereinafter, citations in this Report should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's

impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.   PLAINTIFF'S PERSONAL AND MEDICAL HISTORY

As noted above, Plaintiff was born on December 2, 1962, and thus was 49 years old—a "younger individual"—on the alleged disability onset date of January 24, 2012 (tr. 85).  He turned 50 years of age on December 2, 2012, and his age category thus changed to "closely approaching advanced age" during the relevant period (id.).  Plaintiff has a high school education; he served in the Army from approximately November 1987 through October 1991; and he worked as a corrections officer for about nineteen years, from approximately 1992 until July 2010 (tr. 68, 255, 299, 754).  Plaintiff alleged disability due to back and knee pain, heart disease, high blood pressure, high cholesterol, fainting spells, difficulty breathing, and pancreatitis (tr. 298, 326, 336).  The Veterans Administration ("VA") assessed a 100% disability determination based on Plaintiff's heart condition (tr. 43).

With respect to the relevant medical history of record, the court primarily relies upon the records identified by the parties in the memoranda filed in support of their

respective positions (*see* ECF No. 15 (Plaintiff's memorandum); ECF No. 16 (Defendant's memorandum)), the relevant parts of which are set forth below in the discussion section of this Report.[5]

## V.    DISCUSSION

Plaintiff raises three issues in this appeal.  He contends the ALJ erred:  (1) in determining his RFC; (2) by finding him less than fully credible; and (3) by failing to properly consider the VA rating of 100% non-service-connected disability due to Plaintiff's cardiac condition.  The court need only consider the first claim, because the RFC determination is not supported by substantial evidence in the record as whole, and the case must be remanded due to this error alone.

### A.    Residual Functional Capacity Determination

Plaintiff contends the ALJ erred in determining his RFC by failing to properly account for his lower extremity weakness, which, according to Plaintiff, precludes the performance of work at the light exertional level (ECF No. 15 at 17).  More specifically, Plaintiff contends the ALJ "did not cite or discuss . . . [or make] mention

---

[5] In the court's scheduling order the parties were directed to file memoranda that contained detailed analyses of the administrative record, with specific citations to the record, and were advised that failure by either party to support factual contentions with accurate, precise citations to the record would result in the contention(s) being disregarded for lack of proper development (*see* ECF No. 8).  Although the portions of the record identified by the parties are the court's primary focus, the court will also consider and rely upon other portions of the record as necessary.

of the two detailed orthopedic evaluations" from Stephen L. Hendrix, M.D., a treating orthopedic surgeon (*id*. at 17–18) (referencing tr. 781, 764 (reports of examinations by Dr. Hendrix in July and October 2012, respectively)). Instead, Plaintiff contends, the ALJ erroneously relied on the opinions of non-examining agency physicians and physicians whose opinions pre-date the alleged onset date in determining his RFC (*see id*. at 17).

At step four of the sequential evaluation, an ALJ must determine whether a claimant has an impairment which prevents him from performing his past relevant work. This step assesses the claimant's RFC and measures whether he can perform any past relevant work despite his impairment(s). *See* 20 C.F.R. § 404.1520(e). RFC is the most a claimant can still do despite his physical and/or mental limitations, and the RFC must be assessed based on all the relevant medical and non-medical evidence in the claimant's case record. 20 C.F.R. § 404.1545(a). Such evidence includes statements about what a claimant "can still do that have been provided by medical sources, whether or not they are based on formal medical examinations." *Id*. Where, as here, an ALJ determines that a claimant cannot perform his past work, the ALJ "proceeds to the fifth and final step of the evaluation process to determine whether in light of 'residual functional capacity,' age, education, and work experience the

claimant can perform other work."  Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th

Cir. 2002) (citing Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997)).

Here, in determining Plaintiff's RFC, the ALJ stated she was giving the

"greatest weight" to the state agency determinations, which she identified as Exhibits

1A–2A and 7A–8A, "because the medical evidence supports" them (tr. 43).[6]  The first

two state agency determinations were completed in April 2012, or only shortly after

the alleged period of disability commenced on January 24, 2012 (see tr. 103, 122), and

they are based upon medical evidence dated between 2008 and February 17, 2012

(see, e.g., tr. 97, 99, 116, 118).  Thus, the evidence on which those determinations

were made almost entirely pre-dates Plaintiff's alleged onset date and,

correspondingly, the determinations are only marginally relevant to the overall time

frame under consideration (January 24, 2012, through June 27, 2014).  Similarly, the

latter agency determinations were made on July 6, 2012 (see tr. 146, 166), and thus

necessarily could not have taken into account any evidence of record dated after July

6, 2012.  Accordingly, the ALJ erred in assigning the greatest weight to these

opinions—the type of opinions which, in the usual course of analysis, are generally

---

[6] These exhibits correspond to transcript pages 85–103, 104–22 and 127–46, 147–66, respectively.  The first two determinations/exhibits are identical in all material respects, as are the second two (see tr. 85–103, 104–22 (Exhs. 1A & 2A); 127–46, 147–66 (Exhs. 7A & 8A)).

Case No. 5:16cv107/LAC/EMT

entitled to less weight than opinions from treating sources or examining sources. *See* 20 C.F.R. § 404.1527.

What is more, the ALJ noted only the following medical evidence regarding Plaintiff's lower extremities, which in some respects is irrelevant to the time frame under consideration, and in other respects does not support her RFC finding, as explained *infra*.

1)  *In **2010**, physician A.J. Shores, M.D., noted possible symptom magnification, asked Plaintiff to discontinue use of a cane, and stated that Plaintiff could be returned to light duty work and that there was no reason he needed to be maintained on disability.*

This evidence substantially pre-dates the alleged onset date and has no direct bearing on Plaintiff's condition between January 24, 2012 and June 27, 2014. Although the evidence of possible "symptom magnification" in the past is marginally relevant, it does not establish that Plaintiff malingered during the period under adjudication. In fact, the undersigned has found no indication in the record that any medical source thought Plaintiff exaggerated his symptoms during the relevant period; nor has the Commissioner pointed the court to any such evidence (*see* ECF No. 16). Moreover, even if Plaintiff could have performed light duty work in 2010 and did not need a cane at that time, as Dr. Shores opined, it does not mean Plaintiff had the same

capacities two to four years later or that his condition did not deteriorate after he saw Dr. Shores.

>2)    *On August 18, **2011**, Plaintiff was noted to ambulate well without assistance (tr. 42, citing tr. 715).*

As before, this evidence pre-dates the alleged onset date, though it is closer to that date. Nevertheless, it is of minimal relevance and cannot support an RFC determination, which must accurately reflect Plaintiff's abilities during the period under adjudication.

>3)    *"Within the period at issue," Plaintiff was treated for knee osteoarthritis and low back pain, but "rereads of his knee and lumbar spine x-rays were normal, and he was so informed. He was ambulatory with a steady gait. Use of an ambulatory aid was not noted in . . . VA records at 6F and 11F" (tr. 42, referencing only Exhs. 6F and 11F, as it relates to Plaintiff's lower extremities).*

Exhibit 6F is a 48-page exhibit that consists of VA records from August and September 2011 and the first few months of 2012 (*see* tr. 399–446), and the ALJ did not indicate the precise records on which she relied in making the above findings. Notwithstanding, the undersigned located a VA record within Exhibit 6F, dated April 19, 2012, which states: "Patient brought [a non-VA] CD with x-rays of bilateral knees and [lumbar] spine and requested that they be read by primary care." (tr. 409). Joseph P. Monastero, M.D., reviewed the x-rays and concluded that they were normal (*id.*).

Plaintiff was advised of such by a primary care case manager on May 4, 2012 (*id.*). The ALJ's statements are thus reflected in the record. However, the ALJ neglected to mention *when* the x-rays at issue were taken, and such is unclear from the record. The record establishes only that Plaintiff *brought* x-rays to the VA in April 2012. The x-rays were obviously taken prior to April 19, 2012, or early in the relevant period if at all, but the ALJ either failed to realize this or failed to acknowledge as much.

Likewise, Exhibit 11F includes a VA "nursing entry," which states that Plaintiff "[a]mbulates well without assistance" (tr. 520). This treatment record, however, is dated February 17, 2012. Thus, the ALJ's statement—while again reflected in the record—does not provide substantial support for the RFC determination because the nurse's observation was made *very* early in the relevant period.[7]

> 4) *"[On June 21, 2012, Plaintiff] underwent bilateral knee injections" and "reported for instruction on use and care of a cane, but there was no indication that it was medically prescribed." (tr. 42, citing Exh. 17F). On July 12, 2012, a standard walker for bilateral knee weakness was ordered (tr. 39). A lower extremity CT, obtained on September 10, 2012, showed right knee chondromalacia (tr. 42, citing Exh. 23F). An annual examination on February 11, 2013, revealed bilateral knee stability, joint stability, no effusions or joint line tenderness, and symmetrical reflexes; no walker or assistive device was noted (tr. 39, citing Exh. 23F).*

---

[7] The same treatment record reflects Plaintiff's complaint of chronic back pain and bilateral knee pain (tr. 520), neither of which the ALJ mentioned in discussing this nursing entry (*see* tr. 42).

These findings require more elaboration than the preceding ones, as well as a review of the medical records at issue. Dr. Hendrix treated Plaintiff during the relevant period, including on June 21, 2012, when Plaintiff complained of joint pain involving the lower leg/knee, was assessed with osteoarthrosis and arthralgia of the knee, received corticosteroid injections in both knees, and was instructed on the use of a cane (*see* tr. 664–65, 669–70). More specifically, as to the cane, the nursing note from June 21 states as follows:

> [Plaintiff] in for verbal instruction and demonstration on use and care of cane. Booklet instruction reviewed with [Plaintiff] and [he] verbalized understanding of all information given. [Plaintiff] able to give a proper return demonstration on proper gait and ambulation with cane.

(tr. 669).[8]

On July 12, 2012, Plaintiff returned to Dr. Hendrix and reported bilateral leg and knee pain and worsening weakness (tr. 780–81). He explained that the knee pain was in the front of his knees (tr. 781). He told Dr. Hendrix that since he last saw him in June 2012, he had experienced an incident where he could not get out of a chair and needed two people to help him get out of the chair, so he reported to an emergency

---

[8] Another nursing entry on the treatment note of June 21, 2012, states that Plaintiff had been treated at the VA for bilateral knee pain since 2000, and that on June 21 he reported that his right knee pain was greater than his left knee pain (tr. 672). The note also reflects that Plaintiff underwent a total left knee replacement in 2002 and had follow-up physical therapy for the left knee but no such therapy for the right knee (*id.*).

department for an evaluation (*id*.). He additionally stated that he was using a cane "on a regular basis" and needed to use a cane or the arms of a chair to get up and out of one (*id*). Upon examination, Dr. Hendrix noted that "patient does have difficulty arising from a chair. He does use a cane in his right hand. He does exhibit an antalgic gait that is not specific to knee pain." (*id*.). Both knees appeared benign, other than a scar (*id*.). Examination of the knees indicated mild patellofemoral crepitance and an occasional popping sensation that reproduced some of the discomfort; Dr. Hendrix characterized the knees as "stable" (*id*.). Dr. Hendrix stated that Plaintiff had "difficulty flexing his hips up" and "significant weakness" in the hip flexors, bilaterally, slightly greater on the right (*id*.). Testing of quadriceps extension also revealed difficulty in Plaintiff's ability to fully extend his knees (*id*.). Dr. Hendrix noted "significant weakness with the quadriceps as well [as] in both legs" (*id*.). He also noted mild degenerative changes shown on radiographs and the lack of response to a steroid injection, with progressive weakness of the lower extremities (*id*.). A CT scan with an arthrogram of both knees was ordered "to evaluate for internal derangement" (*id*.). Dr. Hendrix noted, however, that he had "greater concerns for possible neurologic or muscle disorder producing his weakness . . . ." (*id*.). In an addendum to Dr. Hendrix's treatment record, also dated July 12, 2012, VA staff noted

that "Dr. Hendrix has ordered a standard walker for this patient" and that a walker was provided to Plaintiff (tr. 783).

A CT of Plaintiff's lower extremities was obtained on September 10, 2012 (tr. 800). It revealed moderate to advanced tricompartmental chondromalacia in the right knee, greatest in the patellofemoral compartment with full-thickness chondromalacia and tearing of the medial meniscus body (*id.*).

On October 30, 2012, Plaintiff returned to Dr. Hendrix and was evaluated for complaints of chronic bilateral knee pain (tr. 763–65). Dr. Hendrix noted that the steroid injection had not resulted in any improvement, and that he "had concerns for possible involvement of the lumbar spine as the patient does have a history of chronic low back pain and he has pain that radiates down both legs to his ankles" (tr. 763). Dr. Hendrix also noted that Plaintiff continued to use his cane and that Plaintiff had reported "that [he] either needs his cane at all times and he even has a walker due to his back pain and his hip weakness" (*id.*). Plaintiff reported bilateral weakness in his hips and lower extremities, noting that it caused difficulty walking any distance or getting out of a chair, and that it was worsening (*id.*). Upon physical examination, Dr. Hendrix observed that Plaintiff "is very slow to ambulate with a cane and getting up out of a chair" (tr. 763–64). Dr. Hendrix also noted "some mild to moderate

patellofemoral crepitus on the right knee, mild on the left" (tr. 764). He additionally stated: "There is increased pain when I compress the patellofemoral joints and even somewhat when I compress the cartilage over the medical femoral condyles, right knee greater than left." (*id*.). He commented that the seated straight leg test did "reproduce pain in the back and pain down around the hip area all the way down the legs below the knee" (*id*.). Dr. Hendrix further noted that Plaintiff "has difficulty even flexing his hips up against gravity, [and] I can hold his thighs down in the chair, revealing significant hip flexor strength loss at least 1 to 1-1/2 grades" (*id*.). Knee extension was also positive for "at least a half to a full grade of weakness [] in his quadriceps strength" (*id*.).

Upon review of the CT scan, Dr. Hendrix opined that Plaintiff had degenerative joint disease in both knees, but the "greatest concern" was the "weakness in [Plaintiff's] lower extremities and his chronic back pain that [Dr. Hendrix felt was] compromising his knee function" (tr. 764). Further lumbar spine evaluation was recommended (*id*.).

On February 11, 2013, Plaintiff presented to the VA for an annual examination by a primary care physician (tr. 752). He requested x-rays of the knees and low back, complained that his pain had worsened over the past two years, rated his pain at an

eight, and noted that his pain was aggravated by standing or walking (tr. 752, 756, 758, 760). He also reported new joint problems (tr. 756). Examination of the extremities revealed bilateral crepitus under the patella with knee flexion, but otherwise the findings were normal (e.g., knees and joints found to be stable, with no effusion or joint line tenderness) (tr. 757). X-rays were obtained on February 20, 2013, which revealed mild degenerative changes in the knee (tr. 751, 814–15; *see also* tr. 856 (noting that the lumbar spine x-rays indicated narrowing of the L5-S1 disc space high, with noted narrowing at L4-5 consistent with lumbar degenerative disease at that level)).

Turning to the ALJ's findings cited above, the first of which concerns Plaintiff's visit with Dr. Hendrix on June 21 (i.e., the finding that, even though Plaintiff "reported for instruction on use and care of a cane" on June 21, there was no indication that the cane was medically prescribed), this finding is, at best, supported only by scant evidence. To the extent Plaintiff had no "prescription" for the cane he presented with on June 21, it is evident that Dr. Hendrix and/or the nursing staff deemed a cane medically necessary at that time, as Plaintiff was trained on the use of the cane, was provided literature on the proper use of a cane, and was required to demonstrate his proficiency with the use of a cane. Moreover, as the ALJ

acknowledged, three weeks later Dr. Hendrix prescribed a walker due to bilateral knee weakness.[9]

Continuing, with respect to Plaintiff's July 2012 visit, that ALJ stated only that a walker was ordered. She made no mention of the significant weakness in Plaintiff's legs and hips noted by Dr. Hendrix or any of the other findings he made upon examination, such as Plaintiff's inability to fully extend his knees and his difficulty with hip flexion. The ALJ then cited some of the findings from the September 2012 CT but not all of them (such as tearing of the medial meniscus body), and she omitted mention of Plaintiff's October 2012 VA visit altogether. It was in October that Dr. Hendrix's examination caused pain or revealed weakness with, for example, compression of the joints, flexion testing, straight leg raises, and knee extension—all of which led Dr. Hendrix to be greatly concerned about the weakness in Plaintiff's lower extremities and his chronic back pain.

---

[9] It is worth noting that although Plaintiff's visit of June 21, 2012, with Dr. Hendrix pre-dated the July 2012 pair of agency determinations discussed above, the records of the June visit evidently were *not* considered by the agency consultants (the agency consultants noted that evidence regarding Plaintiff's VA visit on June 21 had been *received* and was part of Plaintiff's claims file (*see* tr. 128–29, 148–49), but they did not describe the nature of this evidence or list it as evidence they relied upon in reaching their conclusions (*see* tr. 135–36, 139–42, 155–56, 159–62)).

It should also be noted that the ALJ referenced all of the VA medical records collectively by exhibit numbers only.[10] Although the exhibits she referenced include Dr. Hendrix's treatment records, the ALJ did not mention Dr. Hendrix by name or acknowledge that Plaintiff received specialized orthopedic care during the relevant period. *See, e.g.*, 20 C.F.R. § 404.1527(c)(5) ("more weight [is given] to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

Finally, the ALJ accurately noted the results of an annual examination by Plaintiff's primary care physician in February 2013. However, that she discussed this examination in particular, but did not discuss the more thorough examinations by orthopedic specialist Hendrix on two occasions in 2012, suggests that the ALJ "cherry-picked" the evidence and largely cited only the evidence that supported her ultimate conclusions. *See, e.g.*, Hardman v. Barnhart, 362 F.3d 676, 681 (10th Cir. 2004) ("It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."); Bauzo v. Bowen, 803 F.2d 917, 923 (7th Cir. 1986) ("evidence favoring the claimant as well

---

[10] The VA records are voluminous, totaling over 300 pages, so a general reference to the exhibits, alone, is insufficient to show that the ALJ properly considered all of the records—not to mention that the lack of pinpoint citations to the record complicates and prolongs this court's review of the ALJ's decision.

as the evidence favoring the claim's rejection, must [both] be examined, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight") (citations omitted).

5) *The "most recent VA records at [Exhibit] 24F [tr. 806–54]," which are dated between July 12, 2012, and January 21, 2014, make no "mention of cane or walker use" (tr. 45).*

Although the ALJ's statement is supported by the record, it does not account for the fact that Dr. Hendrix prescribed an assistive device—and Plaintiff reported using one—within the same time frame. What is more, the records contained in Exhibit 24F concern treatment for *other* impairments, as well as miscellaneous health information such as laboratory testing or x-ray results, medication lists, and vital signs data (*see, e.g.*, tr. 809–13, 847 (vital signs); tr. 816–17, 842–43, 846–47 (medication lists); tr. 818–25, 837–39, 848, 852–53 (records from the psychiatry or mental health counseling departments); tr. 826–36, 840–41, 844–46, 849–52 (miscellaneous records regarding medications or non-lower-extremity related impairments)). The undersigned located only five pages within the entirety of Exhibit 24F that directly relate to Plaintiff's knees or lower extremeties: transcript pages 814–15, which contain the radiologist's report of the x-rays obtained in February 2013; and transcript pages 830, 843, and 854, which are progress notes that list all of Plaintiff's "active

problems" when he appeared at the VA for treatment for other conditions, namely, swelling of the right elbow (*see* tr. 828–32), sleep disorders and a fainting event (tr. 841–44), and a bump on the right leg (tr. 852–54).[11] Given the nature of these records, it is not surprising that the records do not note the use of a cane.

The Commissioner appears to urge this court to construe the ALJ's findings, including those regarding the most recent VA records (Exh. 24F), as a finding that Plaintiff failed to seek regular or specialized treatment for his knees after he was treated by Dr. Hendrix in 2012, thus suggesting that his lower extremity issues had resolved or were not otherwise disabling or significantly limiting (*see* ECF No. 16 at 11–16). While the Commissioner's statement might be a fair comment on the evidence of record, it is a statement of the *Commissioner*, not a *finding* by the ALJ, and this court is to review the ALJ's findings, not the Commissioner's after-the-fact rationalizations offered to support the ALJ's findings. Likewise, the Commissioner's thorough review of the medical evidence, and her argument that as a whole it supports the RFC determination for light work, might also be a fair comment on the record, but it is the ALJ's opinion that this court must review. "[A] court may not accept appellate counsel's post hoc rationalizations for agency actions. . . . If an action is to

---

[11] Included in the lists of "active problems" are arthralgia of the knee, gout, osteoarthritis of the knee, and chronic low back pain (*see* tr. 830, 843, 854).

be upheld, it must be upheld on the same bases articulated in the agency's order." Baker v. Comm'r of Soc. Sec., 384 F. App'x 893, 896 (11th Cir. 2010) (unpublished) (citing FPC v. Texaco Inc., 417 U.S. 380, 397, 94 S. Ct. 2315, 2326, 41 L. Ed. 2d 141 (1974)); *see also, e.g.*, Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004) (the district court may not create post-hoc rationalizations to explain the ALJ's treatment of evidence when that treatment is not apparent from the ALJ's decision itself); Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991) ("It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence . . . "); Zblewski v. Schweiker, 732 F.2d 75, 78–79 (7th Cir. 1984) (while strong grounds may have existed for rejecting claimant's testimony, ALJ's failure to articulate reasons for doing so precludes meaningful appellate review).

The ALJ included no further discussion of Plaintiff's lower extremity issues, except to say that the "postural and environmental limitations" set forth in the RFC address Plaintiff's knee impairments, as do the "lifting/carrying and standing/walking limitations of light work" (tr. 43–44). On this record, the undersigned cannot conclude that the ALJ's RFC finding is supported by substantial evidence from the record as a whole. While it is true that Dr. Hendrix did not offer any specific opinions regarding Plaintiff's capacities or limitations, as the Commissioner notes, this did not

give the ALJ license to ignore those portions of his treatment notes that favor Plaintiff's claim. The Commissioner also argues that even if Plaintiff's condition was disabling while he was under Dr. Hendrix's care, there is no evidence that the condition met the twelve-month duration requirement for disability. This argument of the Commissioner misses the mark. The claim Plaintiff raises here concerns whether the RFC determination is supported by the record, not whether Plaintiff's lower extremity condition rendered him "disabled."

In Social Security cases, the role of this court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings, not to find facts. Because of this limited role, the general rule is to reverse and remand for additional proceedings when errors occur. *See, e.g.*, Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993) (referring to general practice); Foote, 67 F.3d at 1562 (stating that an insufficient credibility finding is "a ground for remand when credibility is critical to the outcome of the case"). A case may be remanded for an award of disability benefits, however, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis, 985 F.2d at 534; *see also*

Bowen v. Heckler, 748 F.2d 629, 636 (11th Cir. 1984); Carnes v. Sullivan, 936 F.2d at1219.

Here, it is far from clear that the cumulative effect of the evidence establishes disability without a doubt. Therefore, the appropriate course is to reverse and remand for further administrative proceedings, to include a re-determination of Plaintiff's RFC and possible further development of the record if necessary in this regard, such as determinations by agency consultants based on all of the relevant evidence of record.

Accordingly, it is **ORDERED**:

That Nancy A. Berryhill is substituted for Carolyn W. Colvin as Defendant in this action.

And it is respectfully **RECOMMENDED**:

That the decision of the Commissioner be **REVERSED** and that this action be **REMANDED** for further administrative proceedings..

At Pensacola, Florida this 30th day of August 2017.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.

Case No. 5:16cv107/LAC/EMT